We were literally saved by the bell. May it please the court, Vic Balchuk, ACLU of Pennsylvania, on behalf of J.S. and her parents, I'd like to reserve 10 minutes of rebuttal time, if I may. The Supreme Court has never extended its in-school speech precedents, including tinker, to students off-campus speech, and prior to the panel's decision in this case, this court had not done so either.  However, this court in Sachs, Sipniewski, and the now vacated panel decision in Layshock suggested that the standard should be more protective than tinker, but has not specified what that standard is. Let's call that tinker plus. In our briefs, we have argued for why the standard should be the one that controls government officials' efforts to censor speech in the community or on the internet. We'll refer to that as the community standard. While we have invited the court to clarify the standard, which standard this court ultimately applies should not affect the outcome of this case. Regardless where the line is ultimately drawn, tinker, tinker plus, or the community standard, the school district cannot satisfy its burden here. If that is, the court applies tinker faithfully as it has over the past decade in Sachs and Sipniewski. In those cases, this court made clear that a forecast of substantial and material disruption must be based first on the history of the speech in question. In the absence of a history of disruption from the speech in question, the school has a much harder time justifying the punishment of student speech and can only do so if it has a, quote, particular and concrete basis, end quote, for anticipating disruption. A basis that must be, again, grounded in experience rather than speculation. This case involves an eighth grader who created a mock profile of her principal while sitting in her home on a Sunday using her mother's computer and posted it on the internet. She identified neither the principal by name nor the school district. She put up his picture but said he was from Alabama. No adult who saw the profile, including the principal himself, took it as a serious accusation of wrongdoing. The website never physically made its way into the school until the principal directed another student to bring it in. The only supposed disruption proffered by the school district was that a math teacher had to tell students to shush several times during non-instructional time. Another teacher heard expressions of concern from some students after class. And two guidance counselors rearranged their schedules for meetings, but that was to punish JS, not because of the website. On this record, the school cannot possibly meet even the Tinker standard, Tinker as has been applied in Saxe and Sitniewski. There were no fights, no classes were disrupted, much less canceled, no one except JS was suspended or disciplined. The webpage had been blocked and disabled, JS had apologized and been punished by her parents, so there was no concrete and specific facts on which to forecast disruption. And there was no history of disruption from similar activities to forecast future problems. In short, the school district has advanced no more than a remote apprehension of possible future disturbance, which fails to satisfy Tinker, much less the Tinker Plus or Community Standards. Although the dearth of authority on this issue of students' off-campus speech rights begs for authoritative guidance, it is only if the court determines that the district has met its burden under Tinker to justify JS's punishment that it must reach the bigger question of which standard applies to off-campus speech, Tinker Plus or the Community Standard. Since the school district cannot even meet its burden under the most lax standard, Tinker, we ask that the court reverse the district court decision and enter judgment for JS. Thank you. Mr. Wolczak, maybe I heard you incorrectly, but it seems to me that you didn't talk anything about location. Are you giving up the location argument as the first step? No, Your Honor. What we're saying is that we do not believe that on this factual record that the school district can satisfy Tinker as Tinker has been applied by this court historically for the past decade, notably in cases like Sachs and Sitniewski. But Tinker said that the school must reasonably believe that speech will cause actual material disruption. That was Tinker language. Your Honor, as Tinker says, it's got to be more than a remote apprehension of disturbance. And I think that the most important case that we would look to on how to interpret Tinker is Sitniewski. And if you look at the court's rigorous analysis and where it says that, in fact, you could ban the Confederate flag shirts because there has been a history of disturbance and violence in the school district, and the school district arguing, well, we also have to ban that Jeff Foxworthy t-shirt because it's worn by the same students. And redneck is code, and the court goes through that and says, you know what, you just can't show that there's a substantial and material disruption. So you don't doubt that Tinker applies to off-campus speech? I'm sorry? You don't doubt that Tinker applies to off-campus speech? Your Honor, it is our argument that Tinker does not apply to off-campus speech. What we have is the court saying in Sachs, in footnote 11, then Judge Alito says if it's off-campus, then there's more involved. In Sitniewski, this court says, obviously, if it's out-of-school speech, there's speech. If it's speech which causes an actual, concrete disruption of school activities, Tinker does not apply. Your Honor, that is the argument that we have made. That's the issue. Is that yes or no? Yes. Tinker does not apply. Let me follow up with that with just an example. On Sunday night, a student sends out a mass email to other students saying that we are going to have a major sit-in tomorrow at the school. If you apply Tinker, you have to apply Tinker off-campus to that, don't you? That's contrary to what you've argued in your supplemental brief, but it doesn't fly. Your Honor, frankly, if there's a message that's put out, we're going to have a sit-in tomorrow, and if it's off-campus speech, does that meet the clear and present danger standard? Of course, the school could put out an email and make it very clear in the papers and all the ways it can communicate that, you know, you guys could be talking about a sit-in. Can the school act to stop this disruption on Monday morning? Yes, the school can act and say that if anybody comes in and sits in or creates any kind of disturbance in school, they're going to be punished. Don't do it. We don't care what this kid's saying on the Internet. In that example and in the cyberbullying we talked about in the prior argument, it would seem that we don't really want to go to say that Tinker necessarily applies to solely on-campus and doesn't apply off-campus, because there are examples where it might apply off-campus. Your Honor, I... I just... from the... we're going to have a sit-in tomorrow, and there's a risk, there's a real risk that there's going to be substantial disturbance. Could not those students who sent that out be disciplined? Your Honor, querying whether even under the analysis this Court has used in Sachs and Sitniewski whether there really is a danger if the school makes it very... once that speech is out, the school makes it known, look, we are going to punish any student who does this as harshly as possible. Is that not the way to deal with it, once that speech is already out there? Is that not a way to deal with it? The question is whether they would be permitted to deal with it before it happens. I mean... Your Honor, yes... Yes, the Supreme Court of Pennsylvania, you don't have to wait for absolute chaos. Right, and they can deal with it by educating students, by calling the parents of the student who took that action, by putting out information saying that any student who does this is going to be punished. Let me ask you this... What we've been talking about as Tinker is really dictum, isn't it, Minnie Tinker? In terms of what standard applies outside of school. The reasonable forecast, the forecast business. That's all dictum, isn't it? I'm sorry, I'm not sure that's entirely true. Do you think that was a holding of the Tinker Court? I think that they, that in fact, they were suspended... What was the holding in Tinker? The holding was that the school could not punish the black armbands because there was no... Could not punish them. Right. So that anything that talked about reasonable forecast is dictum because that isn't what happened in the case. Yes, Your Honor. Judge Zwick has a question. Let me come back to Judge Ambrose hypothetical because I'm not sure that I understand your answer on that and you've mentioned Sachs and Sipnisky and some other Third Circuit cases which may be quite persuasive, but of course, they're not binding on this court and we could write a new opinion that goes in an entirely different way from those cases now. With respect to the cyber bullying or something like that, that's directed to a student, not to a school official and if it is pervasive and if it is on Facebook and if it is accessed by other students, not on school property, not on a school-sponsored site, are you saying that Tinker would not apply if, let's say, that individual were severely distraught, was, you know, damaging her health, possibilities of suicide, things like that. No direct threats, just harassment. Are you saying the school would be powerless to discipline that student? Your Honor, and assuming it's completely off campus, because most bullying, it carries on if it's in school, then that's a different matter. Assuming your hypothetical, we are not saying that simply because the expression happens off campus that the school is powerless. They not only can, but in fact, in that kind of situation, especially involving bullying, must take proactive steps. Bring in the kids who are involved. Get the parents involved. Can they punish? Can they impose discipline on the student that created that Facebook? Your Honor, not under the community standard unless they could show that there is a compelling interest or perhaps under another line of cases. For instance, the Supreme Court in Colorado versus Hills has said that in the abortion protester context, if you have that kind of harassment that is directed at somebody, they can't get away from it. Assume in this case that there is substantial disruption, at least to this individual, who is a school member, not able to attend school because of how distraught she is. Again, Your Honor, the school can and should, and I would say must, take some kind of action there. But we should remember that there are other... You're talking past each other on this. Cannot discipline. Is that correct? I'm sorry? The school cannot impose discipline. Under the community standard, yes, the school could not impose discipline. But again, remember there are other players. When you're dealing with a bullying situation like that, it's important to get the other people involved, to get the parents, get social service, maybe get juvenile court, get the police. All of that is just because you don't punish that student. There's other ways to educate and to address the situation without actually having that official who we would say, if it's completely out of school, doesn't have the authority. If two kids are fighting in a park, if two kids go after school and start beating each other up, and every day they beat each other up, can the school take action in that situation? And we would say, again, no. That's an issue for the parents. That's an issue for the police. That's an issue for social services if the parents are not being sufficiently attentive. It's not a situation where the school can mete out discipline for what's going on outside of school. And that would reflect Pennsylvania state law. What if it bled into the school? What if this was cyberbullying that was being carried on, for example, by messages that were being sent around on cell phones? So the horrifying things that were said about this child are being created at home. But they're shown on, oh, look at what went around last night, the latest installment. This is happening in the school. Is it still your position that if the teacher's walking down the hall, see, oh my gosh, we and little Bobby or Susie is over in the corner crying again, that that's, it's still tough luck. Speech occurred outside. Maybe you should talk to them and tell them to be nice, but you've got no power to do anything. Is that the position? No. And maybe I'm not quite understanding. We are not saying you can do nothing in that situation. You can do something. You can't suspend. Your position is clear. The point that Judge Sirica keeps going back to and that I'm pushing you on is, other than saying make nice, bring everybody together, let's sit together and hold hands, can they discipline? That's the question. Under the circumstance I just gave you, can the school say, we've got a real problem in the school right now, doesn't matter that it happened last night at home, it's disrupting things in our school right now, we need to put this kid on suspension. Your position is they can't do that, right? If the student has the harassing speech in school and it would satisfy the Saks or Sikniewski standard in the school, then under that standard you could take some kind of action. That was Judge Jordan's question, though, wasn't it? That was not Judge Jordan's question. Yes, Your Honor. I understood your question. Was it? No. My question is, could they, under those circumstances, under Tinker, say, we've got a substantial disruption, it doesn't matter that the speech originated out of school, it's reverberating in the school now, we can discipline. That's the hypothetical I'm posing to you, and I'm not sure I understand your answer. Your Honor, what we've said is that for purposes of this case, the court can apply Tinker and rule and should rule in favor of the student. What we've said is that...  Can you answer the hypothetical? For purposes of the hypothetical is that you would, under the argument that we have advanced, is that when you're outside of school and those school speech cases do not apply, the community standard applies. Your answer is no. Even though it's disrupting actively in the school and causing harm in the school, your position is the school administrators are powerless to discipline. Not necessarily, because under the... No, no, no. Even under the First Amendment, even under that community standard, there are situations where speech can be regulated, where you can have content-based regulations. You've got unprotected speech, like true threats. Would you finish? I'm sorry, I didn't hear the answer to your question to Judge Jordan. How about this hypothetical? I mean, it occurs to me that at some point, it's either a yes or no that fits within what we think it does or doesn't. Could they discipline under the hypothetical I pose? You started to say something in answer, and somebody asked a question. I just want to hear your answer. You are under the community standard. That doesn't mean we can never regulate or punish speech. So in that situation... What do you mean by community standard? The community standard is if you have any government official who wants to regulate speech in the public square, in the home, in the internet, under Reno versus ACLU. Let's go back to this standard, which the charge here was that he violated the school discipline code, which prohibits the making of false accusations against staff members. The second thing, there was a violation of each school's computer policy.  Don't we have to find that those are illegitimate regulations that are themselves violative of the First Amendment in order to say that this speech can be sanctioned? Isn't there a different fact pattern here, whereby it's not just you can't do this, it's what you did violates a legitimate school policy? Two of them, actually. One of them, false accusations against a staff member, would seem to be something the school could do. The other is a computer policy. Doesn't that distinguish this case? Your Honor, we have, in fact, argued that the school policy is facially unconstitutional, but even if the court doesn't find that they're facially unconstitutional as overbroad, they certainly could be applied in an unconstitutional fashion, and we have, in fact, argued that that's what the school district has done in this situation. So the standard, the school standard that is set is, you're saying, not legitimate? We're saying we have argued in our briefs that the school's policy is unconstitutional. But who can find it is? That it's constitutional? Can there be discipline imposed? Not in this case, Your Honor. Even, I'm sorry, are we talking about Judge Jordan's hypothetical or this case? At some point, I sure would like an answer to my question. I don't care when you get to it, but I'd love to hear it. Your Honor, in this, what we've argued in this case is that regardless which standard the court adopts, we have argued for the community standard, or whether it's the suggestion from this court in the Layshock panel, Sachs and Sitniewski, that when you're dealing with out-of-school speech, it needs to be something more than tinker, it's not spelled out, what that is, even under the tinker standard, as it has been applied faithfully and rigorously by this court in Sachs and Sitniewski, you cannot show, one, there certainly was no actual disruption, there are no facts from which to forecast a substantial and material disruption here. He's got ten minutes more in rebuttal. Oh, that's all, okay. Thank you. Thank you, Your Honor. Thank you. May it please the Court. My name's John Reba. I represent the Appelli Blue Mountain School District. Your Honors, I would like to say at the outset that the district has no interest in becoming a censor of the World Wide Web, as argued by Mr. Walczak in his supplemental brief. The district fully understands the importance of student free speech and the ability to criticize public officials, including principals. However, the district does have an interest in maintaining an environment  and in preventing disruptions in educational teachings of the school environment. The district also has an interest in not condoning defamatory language specifically directed at a school administrator. As this Court is aware, this MySpace profile created by JS portrayed her middle school principal as a sexual pedophile and a sexual predator of young students. This is uncontested. She admitted to this during her deposition. The profile was never intended to be a parody. Rather, as evident by JS's testimony before Judge Monley before the preliminary hearing, the profile was created to harm and defame Mr. McGonigal because she was mad for receiving an address code violation. Moreover, she testified at that same hearing that she did not simply make up these salacious and horrible allegations of Mr. McGonigal, which are contained on the profile. Rather, she took as fact from fellow students everything she wrote on this profile. This is all in the preliminary hearing transcript. For a school administrator, one cannot be called a worse thing than a sexual predator of young children. Such accusations tear apart and destroy the implicit trust parents place in school administrators. The district submits that under Tinker, the panel's decision should be approved for two main reasons. First, as discussed in the panel's decision, there were facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities. As the court has already mentioned, that is specifically stated in Tinker. Although the profile admittedly did not create disruptions that would force the school to shut down, the profile did create immediate disruptions that required immediate attention. It is our contention that without the quick corrective actions taken by Mr. McGonigal, given the nature of the allegations contained on this profile, which may come out to be a sexual predator or sexual pedophile of young children, more substantial disruptions would have taken place. Our position is perfectly summed up by an exchange I had with Mrs. Snyder during her deposition. I asked her this, and this is on the appendix, page 226. Question, you think something like this, and I was referring to the profile, could cause disruptions in the school, the way a school functions. Her answer, I would imagine it could get out of control. Again, this perfectly sums up our position. Second, under Tinker, as this court has already, I believe Judge Van Aske mentioned, I believe that this is a case appropriate for analysis under the invasion of others prong of Tinker. There is, as Mr. Wozniak indicated, relatively scant case law on this prong of Tinker. However, the Eighth Circuit has defined this prong to include speech which could result in tort liability. As talked about before, we believe that this profile is defamatory. As a claim of defamation is a tort, we believe that under Tinker, under that invasion of the others portion of Tinker, judgment should again be found in favor of the district. J.S. argues that Tinker does not apply to off-campus speech. As we indicated in our supplemental brief, this is contrary to the great weight of authority from your sister circuits. Those circuits indicate that geographic origin of the speech is not material. The Second Circuit, the Fifth Circuit, the Seventh Circuit, the Ninth Circuit, as we indicate in our brief, have all respectively applied Tinker to speech that was created solely off-campus. The Supreme Court student speech cases, which we're all familiar with, evolved to ensure that schools would be able to carry out their basic educational mission of teaching students. If the strict geographic straight-line test advocated by Mr. Wozniak in the ACLU were to become law, school districts would be powerless to prevent potential chaos from happening, merely because the speech was created driving to school by a student rather than at school by the student. Finally, the district... Mr. Reba? Yes. I see your light is on. Your brief at page 26 cites cases for the proposition that school administrators need only have a reasonable forecast that substantial disruption will occur to punish students for off-campus speech. Now, I'm interested in that reasonable forecast language, because it has fantastic implications to the whole field of First Amendment speech. Now, reasonable forecast that disruption will occur is different from occurred. So I have two questions. One, did the district court make a finding that the school district made a reasonable forecast that substantial disruption would occur? That's the first. I believe if you read the district court opinion, Judge Monley concluded that it would occur, and I believe that was the conclusion of the panel decision. Well, did the school district make a reasonable forecast? Because don't you have to have the school district's reasonable forecast in advance? Well, Your Honor, I would suggest that that was this profile and the language contained on it, which was printed out and brought into school. But it's not what you or I would conclude. The principal asked that it be printed out and brought into school. That's correct. That's not fair. That's correct. Well, Your Honor, actually we've cited some case law in our supplemental brief that says tinker can be applied. It's immaterial who brings it or how it gets into school. Whether someone alerts someone about it or actually brings it in school, it's actually immaterial. The fact is that somehow the school administrators learned of it. Actually, that happened in Wisniewski. Yeah, but I'm interested in this reasonable forecast language. Other than the dictum in tinker, did the Supreme Court ever sustain a curb on speech on the basis of a forecast of disruption? I'm not aware of other Supreme Court cases other than the four that we've talked about with regard to student speech and reasonable foreseeability. I would suggest, Your Honor, that if you take all these cases together from all the different circuits and Supreme Court cases, the standard is somewhere above mere fear of disruption and somewhere below complete chaos. I think you have to have a standard which permits school districts to take action before it reaches that chaos level. But you have all these cases, the whole line of cases, beginning with Terminiello, takes Scope, et cetera, in which the action, you can't affect the speaker just because the speaker's language causes animosity or disruption. I can just name them, Edwards versus South Carolina, Coates, a street. Now, they're not school cases, but I'm concerned about what this is going, what you argue the First Amendment implications are of your language and this whole reasonable forecast. Well, I'm using the language specifically from tinker, which talks about it. Tinker's holding, as set forth in Morse, and I quote Morse, Tinker held that student expression may not be suppressed unless school officials reasonably conclude that it will materially and substantially disrupt the work and discipline of the school. Right. Is tinker the right metric here? I mean, the dissent in this case said that this case just feels like Fraser. It's lewd and crude words, and that's Fraser. Why does tinker have to do with it? I actually think if you read the district court opinion, and you guys were talking, I touched on this before, I think it's actually employed a hybrid method. I think it is Fraser. But my question is, why isn't Judge Chigares' dissent right on? This case is really Fraser. It's not tinker. Well, I think his dissent was off in the sense that basically Judge Chigares indicated that the facts, as applied to tinker, do not warrant substantial disruption. Because he had to respond to what the majority opinion was. I think everyone on the panel, on my panel, agreed that Fraser did not apply. I don't think Judge Chigares made a point in his dissent. Well, if you take a look at page 317, I mean, he's here, but. It certainly had an effect on me when I read his words. I mean, as the scrivener of the majority opinion, though, I have to say, didn't we specifically say we're not going to reach Fraser? Right. So we didn't say whether it did or didn't apply. Right. The majority did not reach that conclusion. Should not Fraser apply? I'm sorry. Now that we're in bank, should not Fraser apply? Should. In other words, what's the test we're going to use to look at these kinds of conduct? I would submit that, with regards to my conduct, I actually think that the test developed by Judge Munley was accurate. Basically, what his test was was a Fraser test, lewd, profane, offensive, plus an effect at school. He didn't really spell out what that effect was. I think, actually, he was trying to formulate a tinker slash Fraser test. Partly the effect at school. One of the things that struck me here, and one of the things that was given as an example of disruption, was that a group of students came to a teacher and said they wanted to discuss the profile. And that was, from the school's point of view, disruptive. When I read that, I thought, my goodness. And the court sought not to be in the business of determining what are teaching opportunities as opposed to disruption, but you can almost take any inquiring question like that, that one teacher might say, this is a really great chance for me to get these students talking about something which is meaningful and significant. Teacher A may take that position. Teacher B may take that position. Look, my lecture plan today deals with the Pythagorean theorem or whatever it is, and I'm not going to get diverted into a discussion. Probably a civics class would be a better example. I'm not going to get diverted into a discussion of what is probably, at most, some kind of civics exercise. This is disruption. Now, how do we, if the school district comes in and says that we have a real fear, realistic fear of substantial disruption, and they're concerned that their class plans are being disrupted because the students don't want to discuss something else, how do we look at that? Why wouldn't that be exactly the kind of thing the First Amendment is there to protect? The students want to talk about this, and maybe in retrospect, that's the best way, as Mr. Wolchek says, although I'm not sure I'd go as far as he's going, to deal with it, is get the students talking about the hurtfulness of this kind of conduct, the juvenile nature of this kind of conduct, rather than saying, this is disruptive. I had a lesson plan in place. I'm not going to deviate from it. How do we look at that kind of a thing in your disruption analysis? Well, I mean, I agree in the sense that there can be teachable moments about certain things. I'd also suggest that... Well, they're disruptive, too, aren't they? A teachable moment is disruptive. And I also suggest that teachers have lesson plans for a specific reason to teach a certain subject or important point, and that every time one of these profiles comes up, there might be time to discuss it. These type of words matter. I think it would be very hard to discuss this type of profile with a bunch of 7th and 8th graders, with the language and the accusations contained on this profile. Maybe, but there are at least two 7th and 8th graders who are well aware of this kind of language and the draft of it. But in a related question, in looking at the disruption, to what extent, if at all, should we separate out the actual disruption that occurred as a result of the administration's response to the student speech and the student speech itself? Now, here, and I mentioned earlier, it was printed out and brought into the school because the principal asked for that to happen. The principal asked the state police, I think it was, to come into the school. One student goes into class and says, I'm late, I just had to talk to the policeman in the hallway. And then you have the deposition. It's a pretty extreme position taken by the principal in terms of what his authority is to control student speech. It seems like anywhere he's talking about it, anywhere in the Milky Way. How do we look at the disruption? Do we look at actually what happened, the totality of it? Do we separate it out and say, well, look, this would not have happened in all likelihood but for the principal asking that it be brought in or asking student aid to find out who did this and turning the student aid into kind of a roving inquisitor? How do we get a handle on that? I think you have to look at the totality of it, Your Honor. What's our standard of review in looking at it of the district court's statement that disruption occurred? I thought Judge Chigaris went through in detail what happened. Even the majority agreed this was not substantial disruption. Right, but my point is that you have to look at the totality in the sense that this profile was created on a Sunday. That Monday, that next Monday in school, everyone was talking about it. What does that mean? Isn't that what the First Amendment is supposed to do, have people talk? My point is, Your Honor, is that this profile and the words contained on it and the allegations contained on it were such a nature that it was bound to create more problems and more disruptions in the school. More students would have learned about it. It would have got into the community. The community would have learned about it. Let me ask you this question. Are there some circumstances that J.S.'s speech would be protected? You'd agree that if J.S. and K.L. created MySpace and communicated just between themselves, the same content as important as we might agree that it is, that that would be protected? You'd agree with that? If they just had criticisms or concerns about Mr. McGonigal? Between the two of them. Absolutely. Right? Absolutely. All right, so if Mr. McGonigal came up to K.L. and said, You know, how's it going? Everything okay? She goes, Yeah, but, you know, I've had some problems. And somehow gets out of her that there's this profile out there. And that's how it comes in to the school. Because you mentioned a moment ago that you think Frazier applies here, but it's a Frazier plus an affected school. So that's the new test that we should apply. I think that's one of the options you could apply. Okay. But that's your primary argument, right? That was the opinion issued by Judge Monley. We support it. And we also believe under Tinker equally. Under Tinker equally. So you're, let me see if I understand. You're calling for a hybrid. One second. One second. These Jersey folks fight a lot amongst themselves. There's plenty of love. I didn't know he wasn't finished. I never would have been surprised. Of course not. And, of course, I will defer in the future. But for right now. Now we're equal. But for right now, the answer is, it comes in to the school only through Mr. McGonigal's action. Still protected? I think once it gets to the school. No matter how it gets to the school? No matter how. And we cited cases. There's a case, there's a district court case in California. And I'm just using this as an example. That applied Tinker to a case where she Googled her name. And a YouTube video came up. And it was brought to the principal's attention. And that court found that it was appropriate to discipline her, Tinker, based on the threat of disruption. We should be bound by the district court in California? No, I'm not saying that, Your Honor. I'm not saying that. I'm not saying that. I'm not saying you're bound by it. So then no matter what the circumstance of how it comes to the attention, how it gets into school, no matter what, the school may act. Yes. As a consequence. Yes. Do you really mean to be saying that? That's a very slippery slope. I just want to try to understand. You're telling us now that Frazier applied. The panel decision, because Judge Munley said so, the panel opinion saw no need to apply to reach the Frazier issue. And the panel opinion majority decided it on Tinker. You're not talking about Tinker. Are you washing your hands of the majority? No, absolutely not, Your Honor. Absolutely not. Why don't you tell us why the majority opinion was correct? Well, I think it was. Could he answer my question first? And your question, Your Honor? Isn't this a slippery slope that you just didn't answer Judge Greenaway's question? I didn't know whose question was first. I think you have to analyze any speech that comes into the school environment in the realm of under Tinker. Is this going to cause a substantial disruption? You have to have some evidence or some basis for it. Two kids talking about something that happens to come to the principal, if it just complains, concerns, criticizes, hey, he's a bad math teacher, or hey, I don't like him as a principal, he shouldn't have done this, absolutely that speech is protected. Judge Greenaway is being uncharacteristically meek here. I'm trying to get back to her. I can't remember what it was. Maybe you can. Justify that majority opinion. Why don't you try to support the majority opinion which held in your favor? Well, I do support the majority opinion. Absolutely, Your Honor. I absolutely support the majority opinion. And as I stated in my opening five minutes, under Tinker, under the reasonable foreseeable test which the majority opinion used, they concluded, based on the nature of this defamatory profile, that it was likely to cause substantial disruption, which I totally support. And we have not abandoned that whatsoever. So why are you going to Frazier? I was just responding to a question with regards to Frazier. We argued Frazier and, on appeal here, we've argued Frazier and Tinker. We've argued both cases, as opposed to Layshock, who apparently only argued Frazier. We've argued Tinker and Frazier. Well, in footnote 10 of the majority opinion, if I recall correctly, the majority for Judge Fischer said, we're not applying Frazier, but we take account of the extraordinary vulgarity, lewdness, and offensiveness of the language because that tells you something about the reasonableness of your forecast that there will be disruption. What's wrong with that reason? It doesn't take you into Frazier. It just recognized what every shock jock in America knows, which is if you say something horrible, your ratings go up. More people pay attention and talk about it. Why isn't that the appropriate way to look at the kind of language that was used as being pertinent to Tinker instead of going into some hybrid Frazier world? Your Honor, I don't want to confuse the Court. We are not advocating that Tinker does not apply in this case. I'll just reiterate that we've argued that Frazier could apply, Judge Mone's decision. The hybrid center could apply as well as Tinker. And for all the reasons that the majority laid out, and I hope I'm answering your question, and please tell me if I'm not, that based on this language, it's reasonably foreseeable, this language as well as the immediate actions this language caused. So you don't need a hybrid Frazier-Tinker test, right? No, you don't need a hybrid. You don't need a hybrid. Going back to Judge Greenaway's point, apparently there was no disruption. There was no violent speech. There was no call for disruption. Whatever existed seemed to be a buzz among students, a conversation among them. But it was initiated by the principal himself. Doesn't that factor into this equation, whether there was a forecast of disruptive behavior? Well, the initial buzz was not created by the principal. The initial buzz, if you read the record, was created solely based on the contents of this profile. The next day they came to the school, they were all approached by the friends that were talking about it. There was buzz before the principal's statement and after the principal's statement. Yes. I mean, it created an immediate... We point this out in our brief, is that it's our opinion, if Mr. McGonigal didn't act as quickly as he did, this would have reached the actual and substantial disruption test. These are middle school students. These are not post-docs. There's going to be a buzz. My goodness. And if the standard for substantial disruption is you've got to nip the buzz in the butt, then there's not much First Amendment... I really didn't mean that. There's not much First Amendment left. There's always going to be a buzz. That's what middle school kids do. They gather in the hallway and they chitter about things and they giggle and they act pretty silly to grown-ups sometimes. And it starts because one of them saw something. And in this case, the student did try to restrict it. Now, the majority says that that seems to have ended the school. But in a small community, my goodness, everybody in that community is in the school. So if you try to limit it just to your friends, you're trying to keep it out of the school. You're not trying to launch a cybernetic grenade into the hall room, into the classroom. And it seems like your approach to this would negate all of that, would ask us only to focus on the fear of, I think you're saying, substantial disruption, including the disruption that was caused by the administration itself and the way they responded to it. And forget we're talking about 7th graders or 8th graders, and there's some chittering in a study hall. Of course there's chittering in a study hall. That's what study halls are for. They're the 7th and 8th graders. I'm kind of perplexed by the extent to which you seem to suggest that we should ignore reality when we graft the First Amendment limitation onto this speech, as abhorrent as it may be. Again, Your Honor, I refer back to my opening statement when I cited Ms. Snyder's own testimony at her deposition when she said it could get out of control. I refer back to my statement when I set my deposition statement interaction with Ms. Snyder when I asked her about the effect of this profile at school. Let me bring Tinker up to date. Today, is it your position that if a couple middle school students walked into a class in a Jewish neighborhood, wearing swastikas, could the school district discipline them? Yes. If there's a history. In that case, I mean, I think your case is talked about. If nothing had happened yet, but they know who the students are, so you just wouldn't throw aside Tinker? Exactly. I think that is the Confederate flag issue. If there's a history of problems in that school district with anti-Semite behavior, sure. I think you could discipline that student. Even though nothing has happened yet? If you can show it's reasonably foreseeable that that shirt in that school district would create problems or fights or disruptions that would affect the basic educational mission of a school district, I absolutely believe it. What do you do to all these, this whole line of Supreme Court cases, starting with Terminelli? You just say they no longer apply because it's a school? Well, I think if you look at the Supreme Court cases, they talk about the unique special function of the school environment. And I think there are different standards applied to that school environment in terms of- So what would the standard be? So tell us, what would the standard under the First Amendment be in that hypothetical that the court would have to use? I would use a Tinker standard, Your Honor. But in Tinker they said that it was all right. You couldn't stop them from wearing what they thought were offensive armbands. So how can you use the Tinker standard against Tinker? Well, in Tinker they looked at actual disruptions. What were the actual disruptions? And the court majority concluded there were none. In the Sanusky line of cases, which I think is the analogy you're going down, they looked backwards. They looked at past practice and whether that type of language had any impact and could reasonably be foreseeable to cause problems to the education of the students. So I think, you know, Tinker combines, can encompass both those arguments. So a well-meaning school principal in my Swastika hypothetical who says, Oh my God, this is a generally Jewish neighborhood. These kids are going to get very upset. So I am going to throw them out of school for the next 10 days because I think that based on their background there's going to be a disruption. And how do we review that standard? I think it requires more than his or her own personal opinion. I think the principal needs to consult maybe with prior administrators to make a determination. And consult with them all and say this is a terrible thing. Well, no, in terms of whether this type of behavior, whether wearing this type of shirt into class has ever happened before, what happened if it did, and make that determination. I mean, each of these- That means the first time it happens you get a pass because it never happened before. So the first person in with the offensive T-shirt gets to wear it. Second person, you're in trouble. That's what you're saying. If there's no history, then there's nothing for the principal to rely upon. I'm not quite sure I follow that. Well, I don't think you can- I mean, I don't think you can take away common knowledge from a situation. And for instance, in this case, she admits it was a sexual- this was a sexual predator. She portrays him as a sexual predator. Common knowledge indicates that's going to cause disruptions. I mean, I don't see how this type of speech leveled at a school administrator amongst seventh and eighth grade students. No one took it seriously, including those adults who had a legal obligation to report this information if they really thought there was something there. They all say it was lies and it was juvenile kinds of- No one took this stuff seriously. Not to say it wasn't offensive. It clearly was. But no one took it seriously. Mr. Reed, but don't you really have to go back in looking at this and assessing the reasonableness of the forecast of disruption? Don't you really have to look at the speech and what the disruption would be if no action was taken? Yes, Your Honor. And isn't that the crux of this? I mean, if the principal had done nothing, if they had left this entry up on MySpace, which was, by the way, apparently accessible to anybody who could get onto the URL without the privacy code, don't you have to really look at what the impact would have been if nothing was done? And isn't that what they did here? Absolutely, Your Honor. And if this is permissible- If you look at the speech and no one takes it seriously, doesn't that also inform you? If nobody takes the speech seriously? If no one believes the content to be true, obviously Mr. McGonigal's reaction in assessing it was, you know, obviously I knew it wasn't true, it was false, although it may have been malicious. Did not McGonigal testify to a severe deterioration of discipline as a result of this? As a result of this profile and its accompanying lawsuits. He responded to the other question about it being taken down from MySpace. That's not the issue. Maybe that could become the issue in another case. Whether or not it can be taken down from MySpace is not the issue. The issue is whether or not the student who put it up there and tried to restrict his access can be disciplined for it. I see my time's up. If I could finish my thought here. Well, if you're answering my question that wasn't a question, then you can proceed. Thank you for your time. Thank you. Thank you. In terms of Tinker, it's substantial and material disruption. It's not just disruption. What is a buzz? If you look at what happened in this school, there were no fights. There was no violence. In Tinker, if you read the dissent, Justice Black said the math class was nearly wrecked because you had this inflammatory... But isn't the... Mr. Walczak, isn't... I mean, look, this all happened in a matter of about four days. If this entry on MySpace had been allowed to stay up there, and if others gained a URL address and had been able to get on it, like the principal did, I think, on Wednesday, and all this material was up there and it quickly spread throughout the community. Weren't there going to be some people who thought, wait a minute, is this McGonigal, what they say he is on this page? Isn't that going to just completely disrupt that middle school? Isn't that what's going to happen? Your Honor, three responses. First of all, I mean, let's remember who's saying this. I mean, you've got an eighth-grade... You've got an eighth-grade girl who's saying something that's juvenile and crude about the school principal. Also, it's not... Does that matter? Your Honor, nobody took this profile seriously, including... You're saying nobody took it seriously. You don't know that, and the record shows that McGonigal was concerned about it. Right. He was concerned, but he did not believe that this was an accusation. He was offended, and certainly he had every right to be offended. But the superintendent... I'm sorry. I'm sorry. But the superintendent didn't take it seriously. If she did, she would have had to launch an investigation. But as a matter of fact, nothing would have happened if there wasn't discipline because the website was taken down. The principal spoke with the students, spoke with the parents. She apologized. Mr. Walczak, isn't that after the fact? Isn't that after the fact? The suspension was for the creation of the MySpace page and the dissemination of the MySpace page to the fellow students and the potential disruption that it had within the school district if nothing else was done. That's what the suspension was about. Your Honor, again, I think you have to look at the entire situation in context, and given that the website is taken down, the student has been talked to, the parent has talked to the student... You're saying you can't do anything about that because of your actions, that you cut out the potential disruption, and therefore your hands are tied, you're powerless. Is that what you're saying? Your Honor, I think under this Court's application of tinker, as it was applied in Sachs, as it was applied in Sibniewski, there is... We are in bank. That's right, Your Honor, and we certainly urge this Court not to retreat from what we believe is a faithful application of tinker. I mean, schools are places where kids talk. They have to talk. The Supreme Court has drawn certain limits, but, in fact, this case, the facts of this case come nowhere close to being able to satisfy tinker as it has been applied by this Court in the past. Some of the disruption here was the girl being welcomed back by her students, fellow students, after she returned from the suspension, the locker being decorated because of the suspension,  and is late, I guess, in talking to the police officer and the fact that it was called in. Are you saying that if you take down the MySpace site, and you're not arguing, I guess, that the principal can't take it down, if you take down the MySpace page and don't call in the police, don't suspend the kid, we don't know for sure what kind of substantial disruption would result. No, I certainly don't believe it's appropriate for the school district to be able to take advantage of. It's what we would say is an overreaction here by contacting the police. I believe I heard Mr. Reba say that part of the buzz and part of the concern was in response to the lawsuit, and it's the lawsuit that undermines the school officials' authority. That's not the website. They can address, school officials can address the problem by discussing it with the student and his parents or contacting law enforcement or social services. Don't withdraw from what you said there. Your Honor, I'm not at all. I thought you were, too. And he did, in fact, call the cops, and the cops went and visited and brought no charges because there was no basis to bring charges. And, again, those are the alternatives, the non-punitive alternatives that we've been talking about. Schools are there to educate. The only way to educate is not just to punish the students. That's part of the disruption caused by the profile. To educate. Your Honor, I'm not sure how educating a student, which is what schools are in the business of doing, and using this as a teaching moment could be considered substantial and material disruption. Yes, I understand. I was urging the students. Before you go, Judge Bernanke. That's all right. I was going to ask, though, because earlier in the first part of your argument, I thought you were acknowledging there's certain speech that would not be protected, like a true threat. A true threat, even uttered off campus, could result in discipline for the student. Is there other speech that's not protected because it's actionable as an invasion of somebody's rights, the right of privacy, false light, that uttered off campus could result in discipline for the student? False light, I'm not exactly sure what that would mean, but certainly true threats, clear and present danger, obscenity. And coming back to Judge Jordan, let me try again. The answer is yes, under that kind of extreme hypothetical, under the community standard, the school could take action because that speech could be considered a clear and present danger. So just like you can't falsely yell fire in a crowded theater because you could start a stampede, somebody's going to get hurt, in that kind of extreme situation where you're dealing with targeted, focused, pervasive, severe bullying, that may just satisfy the clear and present danger standard, or there may be another avenue, as I suggested before, under the Colorado versus Hill line of cases. Could not the school have adopted the code that it adopted that prohibits false accusations against a school staff member because of the anticipated disruption it would cause, so that if the accusation is false, if it's directed against a school member, how would that not satisfy constitutional standards? Your Honor, I think you may eviscerate the First Amendment by saying you can't utter something that's false. I mean, that's New York Times versus Sullivan, and the First Amendment needs breathing space. In the school, when it's directed at a staff member, the school cannot regulate that? Your Honor, again, I would distinguish inside the school where the officials have far more latitude. If it's outside the school, if it's directed to, if it's about a school official, that's what the First Amendment is all about. It's false. And it's false. And as the Court said in the Layshock opinion, it's not for the school to decide whether or not that's defamatory. That's something that has to be dealt with in court. There's a matter of due process there. To vary Judge Slobodar's excellent hypo, what if the principal were depicted as a Nazi wearing an SS uniform and were called an anti-Semite? Can the school punish in that circumstance? Outside of school? That's correct. Your Honor, and, of course, that would be quite offensive, but that's not so much different from Hustler versus Falwell. Again, that's a parody. And outside of school, that kind of speech is protected. And as the Supreme Court has said, there is lots of speech out there. All of these Internet sex cases that this Court has handled for the last 13 or 14 years, that doesn't involve nice or pleasant speech. But the reason the Court has rejected all of those statutes and held them unconstitutional is that otherwise you are going to encompass and suppress socially valuable speech. And I don't know if anybody is going to claim that the speech here is socially valuable, but if you set up a standard that allows the school to punish this kind of speech, then you're jeopardizing the First Amendment because you're allowing the school to punish socially valuable and useful speech. And as the Court has repeatedly said, whether in Cohen versus California or in the Hustler case, there is simply no principled way to draw a line about what's outrageous, what's offensive, and what's important. Substantial disruption, that's the Supreme Court's line. In Tinker, a political case in which first core First Amendment issues were in play, the Supreme Court of the United States said if you've got a reasonable forecast of substantial disruption, you can stop it. That's a principled line, isn't it? Your Honor, the problem with that standard outside... The Supreme Court's standard. That's the standard inside the school. The problem with that standard outside the school is there are lots of examples I can give where it clearly causes substantial and material disruption. We've got Blake Robbins and the webcam. That certainly caused substantial material disruption. We had a case out of Somerset County a number of years ago where a student was challenging a school-sponsored baccalaureate that had been going on for decades. In that case, the state police were called out and had to provide protection at the graduation. Certainly created a substantial material disruption. Your Honor, you're back to geographic distinction. You're saying that there are some things which even though they clearly reverberate powerfully within the school, if it happened just across the street, no disciplinary action can be taken. Your Honor, under the community standard that we're advocating, you punish not the speaker, you punish the wrongdoer. If you've got kids who are acting on that kind of speech inside the school who are engaged in a sit-in, who are engaged in inappropriate language inside the school, you punish the speaker, not the person who's speaking outside the school. In addition to the very disparaging profile that Jay has issued, she urged the students to call the principal's office and to complain, and she urged the students to send faxes to the principal's office, and they did all of that. Couldn't she be disciplined for that conduct? If it's – I mean, that's – I think Your Honor is positing the Doniger case, and with all due respect to the Second Circuit, it strikes me as if you have a student who is in a nonviolent way mobilizing the community to try to overturn a decision that a school official has made, that that is pretty close to political speech, and the fact that the school got a few phone calls and parents expressed their displeasure and other students expressed their displeasure in a respectful way, that that is constitutionally protected speech. No discipline. Thank you, Your Honor. Thank you. Both sides for a very helpful argument in both this case and the preceding case. Very – obviously, very, very difficult cases, and we do thank you for the ability in which you have argued your points to us. I take the matter as under advisement.